## <u>DECLARATION OF LARONNA LASSITER SAUNDERS</u>

I, LaRonna Lassiter Saunders, being of sound mind and lawful age, and duly sworn, hereby make the following declaration, which includes a pertinent timeline and background, to fully explain the release of information:

### <u>Timeline and Background</u>

1. I reside in the State of Kansas. I am a licensed attorney in good standing in Kansas and Missouri. I have been practicing for 22 years.

   In addition to my full-time job, I have a part-time law practice where I offer pro bono and low bono legal services. I also founded a non-profit organization, dedicated to advocating for and supporting individuals with limited resources as they navigate the legal system.

2. I represent the family of Taylor Lowery, who was killed by police in Topeka, Kansas, on October 13, 2022. Shortly after the shooting I was retained by members of Lowery's family, including  Da'Mabrius Duncan,  the mother of his child. They sought my help in gathering information about Mr. Lowery's death, including obtaining the body cam footage. Obtaining the footage to understand what happened to Mr. Lowery is not only crucial to the family, but also a basic and reasonable request for anyone who has tragically lost a loved one.

   I also assisted the family in securing attorneys William and Paeten Denning, a father-daughter law firm based in Overland Park, Kansas, to represent them in this civil case. While I have not formally entered an appearance in the case, I have worked with and assisted attorneys William and Paeten Denning in their representation.

3. On November 23, 2022, I accompanied Ms. Duncan to view the body cam footage at the police department. At that time, we met with Lt. John Sturgeon, who told us he could not confirm if he had all the relevant footage. We were permitted to see the footage he had available. This footage showed that Mr. Lowery was shot multiple times by multiple officers as he was picking up a wrench and backing away. He was not holding a knife; the knife was on the ground near the Officers' feet.

   This footage was extremely difficult to watch, particularly for Ms. Duncan. For that reason, I asked to end the session and come back again after Lt. Sturgeon was able to compile all of the video.

   After that meeting, I reached out to Paeten Denning to join me in reviewing the footage and offering legal representation for Lowery's family.

4.  On January 4, 2023, I emailed Lt. Sturgeon requesting that Attorney Denning and I be allowed to review all body cam related to Mr. Lowery's killing. At that point, the city attorney, Amanda Stanley, and Lt. Sturgeon created several roadblocks to access the footage, including charging a $50.00/hour fee to review the footage. I escalated my

**EXHIBIT A**

concern to the former city manager, Stephen Wade, who acquiesced and allowed us a limited viewing of the footage.

5. On February 26, 2023, after repeated pleas from the family and failed attempts to have Amanda Stanley and the City of Topeka release the footage, the community came together for a press conference.

6. On February 26, 2023, after repeated pleas from the family and failed attempts to have Amanda Stanley and the City of Topeka release the footage, the community came together for a press conference.

The community, supported by several hundred petition signers from across the U.S., called for the release of the video, surrounding Mr. Lowery's death. We stood firm in asserting that the public has a right to know how law enforcement interacts with the community and should be aware of the City and Police Department's attempts to block access to the footage.

The press conference demonstrated that I had no intention of releasing any protected content involving the juvenile or third-party witnesses. Our sole focus was to show the public what occurred during the moments when Mr. Lowery was shot, which is the part of the video the judge ordered to be released.

I would not knowingly violate a court order to release portions of the video that I deemed irrelevant and expressly stated so 2 years ago. (Refer to the URL link below, timestamp 9:30-9:50).
https://www.cjonline.com/videos/news/local/2023/02/28/families-topeka-police-shooting-victims-plea-release-body-cam-footage/11362075002/

7. Over the next year and a half, the Dennings and I have worked together to continue the fight for release of the footage. In our representations of Ms. Duncan, we played different roles. The Dennings were responsible for the legal strategy and court proceedings. My role involves working with the family, community, and the media. I ensure the family understands the process and help support their wishes that the community and public be informed about what happened the night Mr. Lowery was killed; as well as work to change policies to prevent such tragedies in the future.

I also assist with the depositions due to my trusted relationships with the Lowery family, and my extensive knowledge of the case. Additionally, as a native of Topeka, I possess historical knowledge of the City and its practices. For example, during a deposition, I highlighted to counsel the Officers' ability to arrest white males carrying knives, swords, and machetes—one such incident occurred just a week before Mr. Lowery's death, at the very same Kwik Shop.

Although our roles differ, we have maintained communication throughout the process, including discussions about the litigation to obtain the bodycam footage. I keep Mrs.

Denning informed on any client, community, or media matters related to the case, and she keeps me updated on the civil case.

## Explanation of all confidential information released to any third party

8.  On December 13, 2024, there was a hearing regarding Defendant's request for a protective order. Afterwards Mrs. Denning sent me a text that stated, "We won the protective order."

    Despite our busy schedules and limited time, we had a brief call regarding the City of Topeka's attempt to block information by seeking a protective order. She and Mr. Denning opposed this, arguing that misinformation had already been made public. There was no mention of the existence of a partial protective order. She said she would send me documents related to the hearing.

    Later that day, Mrs. Denning emailed me five attachments, including the briefings, Defendant's motion, Plaintiff's response, the Judge's order, and the exhibits. As usual, upon receiving the email and documents, I did not read them but moved them to the client's folder.

9.  Unbeknownst to me, on December 26, 2024, Judge Mitchell entered a partial order protecting these three (3) areas:
    I.   Any portion of any body camera footage that contains or reveals any person's contact information, birthday, personal identifying information, or information or images of any minor children.
    II.  Any portion of footage of Kansas Bureau of Investigation ("KBI") interviews that contains or reveals any person's contact information, birthday, personal identifying information, or information or images of any minor children.
    III. Any portion of any footage of law enforcement interview of victims or witnesses that contains or reveals any person's contact information, birthday, personal identifying information, or information or images of any minor children.

    It is my understanding Mr. Denning informed the court and defense counsel, at the January 30th hearing, that they had not notified me of this order before providing me with access to the footage.

10. On December 30, 2024, I received an email from Mrs. Denning with a link to several videos. I only downloaded:
    - Axon body video of Gillum
    - Axon body video of Good
    - Axon body video of Netherton
    - Axon body video of Ahlstedt
    - Axon body video of Evans

- Audio recording of the police footage viewing with Mrs. Denning and myself – titled "Saunders KORA Viewing" (which neither Mrs. Denning nor I consented to, nor were we informed that it was being recorded).

11. I did not have access to the Kansas Bureau of Investigation ("KBI") interviews. Any information regarding the current KBI Director Mattivi representing one of the officers was received through conversation with counsel.

12. The very next day, on December 31, 2024, I did my job, which was to coordinate with the media and legal strategy team, to determine the best way to correct the false narrative and allow the public to see what really happened to Mr. Lowery.

13. The meeting was attended by the plaintiff and her daughter via Zoom, Mark McCormick and Sherman Smith, journalists from The Kansas Reflector,  and Sheila Albers, a KORA advocate assisting the legal team as a communications strategy advisor.

14. At that December 31st meeting, still operating under the impression that "we had won the protective order, " I played portions of three Officer videos - Good, Gillum, and Netherton. Although I was unaware of the protected content, I still fast-forwarded past the parts of the video showing the juvenile and witnesses' information, because I did not find it relevant to the shooting of Mr. Lowery in the Kwik Shop parking lot.

15. During Officer Gillum's video, I once again skipped over all personally identifiable witness information. I only showed a portion of the brief interaction where a white male stated he had a knife and a joint on him. I then contrasted this with the officers' interaction two minutes later, where they shot Mr. Lowery, a Black man holding a wrench. The purpose of showing these two sections was to highlight the stark difference in how the two men were treated. This is the portion Mr. McCormick referenced in his opinion editorial. Mr. McCormick did not view the full original videos. He did not see, nor hear, any of the third party's personally identifiable information.

16. At that meeting, which has been referred to as an "interview," and even mischaracterized as a "press conference," no juvenile images or information were shown; no third party personally identifiable witness information was shown; and  none of the individuals present saw any confidential information covered by the protective order.

17. On December 31, 2024, shortly after the meeting concluded, I created a folder on google drive and uploaded the officer videos. The videos were unredacted, as again, I was unaware of the protective order at that time. The folder contained the following:
- Axon body video of Gillum
- Axon body video of Good
- Axon body video of Netherton
- Saunders KORA viewing audio

I then added folder access for Mr. Smith and Ms. Albers. While Ms. Albers was given access as one of the legal advisors, she confirmed, and I have verified, that she never accessed the link.

Mr. McCormick was not given access to the link. Mr. Smith is the only person who accessed the unredacted videos.

18. With the Plaintiff's permission, I also uploaded several non-confidential documents. These were not obtained from Defendants and were not subject to the order, but I will list them in the interest of transparency.

   • KBI Media Release – Officer involved shooting – dated October 13, 2022
   • Dennings second preservation letter to Amanda Stanley – dated June 1, 2023
   • KBI Letter denying second request to records stating a need for court order  -  dated May 4, 2023
   • KBI Letter re status update of records request – dated April 6, 2023
   • KBI Letter denying record request stating a need for court order – dated March 29, 2023
   • Dennings KORA request to KBI – dated March 24, 2023

I also provided Mr. Lowery's autopsy report, which contradicts items in District Attorney Mike Kagay's public report. One of them being the claim that Mr. Lowery had cocaine in his system.

19. The following day, on January 1, 2025, I updated Mrs. Denning about the meeting and informed her of the planned date to run the story. During that conversation, which covered several topics related to the case, I learned for the first time that a partial protective order had been issued, preventing the release of juvenile and witness information.

20. Upon learning about the protective order, I immediately contacted the reporters to inform them of the order. I told them I either needed to replace the videos with redacted versions or they would have to remove any juvenile and witness information before releasing it to the public.

During those conversations, I confirmed that Mr. McCormick did not have access to the folder; and that Mrs. Albers had not accessed the videos and had no intention of doing so. Mr. Smith assured me that he would not release any information the plaintiff did not want to make public. I considered the issue resolved.

21. On January 3, 2025, in a Zoom meeting with Eric Ortiz from NBC News, Mrs. Denning and I discussed the protective order and the restrictions on the video release. I showed him portions of the same three videos, but we limited it to the shooting at the Kwik Shop. He did not see any juvenile images or information, nor any personally identifiable information of third-party witnesses.

He mentioned that NBC's standards would likely require even greater redactions than the protected content due to its graphic nature of the video. He also noted with working on other stories, he would not need the videos until around the time he planned to publish it.

Shortly after the meeting with Mr. Ortiz, I met with Danielle Twemlow, another advocate and advisor on my legal strategy team. I updated her on the earlier meeting with Mr. Ortiz and showed her the same portions of the three videos that Mr. Ortiz had seen. She did not see any juvenile images or information, nor any personally identifiable information of third-party witnesses

22. Later that day on January 3rd, I granted Mr. Ortiz and Ms. Twemlow access to the folder. While Ms. Twemlow was given access as one of the legal advisors, she confirmed, and I have verified, that she never accessed the link.

Since I had removed the original versions of the videos upon learning about the protective order, the link to the originals was no longer active. Therefore Mr. Ortiz was not able to access the original unreacted videos. Mr. Ortiz was only able to access the non-confidential documents referenced in paragraph 18.

23. Over the next few weeks, myself, the reporters, the legal advisory team, the Plaintiff, and the Dennings had various communications regarding the dates to the publish the videos. None of those conversations were with the whole group together. This was the root of the miscommunication.

24. On January 29, 2025, The miscommunication was discovered when Mr. Smith expressed frustration and set a firm release date. I believed Mrs. Denning knew I had given the videos to Mr. Sherman based on the December 31st meeting update. Also, during our multiple communications, Ms. Duncan and I consistently stated dates that he was prepared to "run" "release" and "publish."

The Dennings explained that they thought we were only discussing the release of the video, not that it had already been given to Mr. Smith. Hindsight, I see this breakdown in communication was attributed to a number of factors: 1) this being the first case we have worked on together, navigating our respective roles, and 2) our extremely busy schedules, which allowed for only brief moments of communication.

25. This misunderstanding and breakdown in communication led to the unfortunate release of the original video to Mr. Smith. None of us intended to willfully or maliciously disregard the Judge's order.

**The extent to which I am aware that confidential information has been further disseminated**

26. The legal team immediately addressed and rectified the unintentional disclosure; and we have since closed the communication gap with the following actions:

    a. On January 29, 2024, Mr. Denning provided me with a copy of the December 26th protective order. I have reviewed it and am now fully aware of the three protected areas:

        1. Any portion of any body camera footage that contains or reveals any person's contact information, birthday, personally identifying information, or information or images of any minor children,

        2. Any portion of footage of Kansas Bureau of Investigation ("KBI") interviews that contains or reveals any person's contact information, birthday, personal identifying information, or information or images of any minor children,

        3. Any portion of any footage of law enforcement interview of victims or witnesses that contains or reveals any person's contact information, birthday, personal identifying information, or information or images of any minor children.

    b. The legal team assisting me with the case is also aware of the protected content. We are willing to sign the affidavit that was attached to the December 26th order.

    c. I have deleted the original videos from the folder, replaced them with protective-order-compliant redacted videos, and placed those redacted videos in the folder for Mr. Smith and Mr. Ortiz access. Mr. Smith chose not to delete and instead made his own redactions.

    d. On January 31, 2025, closer to his publishing date, I provided Mr. Ortiz with access to the three redacted officer videos for Good, Gillum, and Netherton. Mr. Ortiz used the redacted videos. He has confirmed that he and his editorial team only have possession of the redacted videos.

    e. We have confirmed that the only person outside the legal team who has accessed the unredacted footage is Mr. Smith. I, along with others from the legal team, have asked Mr. Smith to delete and swap out the footage, but he has not done so. Mr. Smith has confirmed that he still retains a copy of the unredacted footage but states he has no current intention of publishing it.

27. Mr. Smith, from the Kansas Reflector, is the only person outside the legal team who accessed the unredacted footage. He gave his word not to release the protected information and he kept his word.

Mr. Smith has redacted and not released the protected content, although he obtained the footage legally and is under no legal obligation to do so. His decision to protect the

content speaks to his character. This is one of the reasons I chose him to report on the story.

28. On January 31, 2025, Mr. Smith published an article titled "Videos show Topeka police killed Black man holding wrench, not knife, contradicting narrative," on the Kansas Reflector. **None of the protected content was published**. https://kansasreflector.com/2025/01/31/videos-show-topeka-police-killed-black-man-holding-wrench-not-knife-contradicting-narrative/

29. On, January 31, Mark McCormick published an opinion article titled, "Without greater transparency, arrogance and shocking police shootings will only continue in Kansas." **None of the protected content was published.** Mr. McCormick references the brief interaction mentioned above, but no third-party personally identifiable witness information was known nor disclosed. https://kansasreflector.com/2025/01/31/without-greater-transparency-arrogance-and-shocking-police-shootings-will-only-continue-in-kansas/

30. On February 1, 2025, Mr. Ortiz published a story titled "Family releases bodycam video of Kansas man's fatal shooting by police" on the NBC News website using the redacted footage provided. **None of the protected content was published.** https://www.nbcnews.com/news/us-news/family-releases-bodycam-video-kansas-mans-fatal-shooting-police-rcna187001

31. I take my obligations as an officer of the court very seriously. Once I learned of the protective order, I took immediate steps to ensure compliance. I will continue to comply with this and all future court orders.

32. I declare all of the above to be true under the penalty of perjury.

*LaRonna Lassiter Saunders*

**NAME**

*[signature]*

**SIGNATURE**

2-25-2025

**DATE**

JACKLYN WINTERS
Notary Public-State of Kansas
My Appt. Expires 10-11-2027

**ATTESTATION OF SIGNATURE(S)**
State of Kansas    County of Johnson
Signed or attested before me on 02/25/2025
by LaRonna Lassiter Saunders.

*[Notary signature]*
Notary Public Signature    (SEAL/STAMP)